American Fidelity Assurance, case 18-6210. Mr. Fetterman, we're ready to hear you. Thank you, Your Honor. I'd like to reserve three minutes for the rebuttal. May it please the Court, good morning, Your Honors. William B. Fetterman for the appellant. American Fidelity Assurance Company is lost on summary judgment at the dishcourt level. We are seeking to have that judgment reversed by this Court and allow us to proceed to trial. The Court reviews the grant to summary judgment de novo, as it's aware. The district court misread the underlying contract called the PSA, the pooling service agreement, and there are genuine issues of contested material fact that should have precluded the entry of summary judgment. Appellant is an Oklahoma-based insurance company. The money here is the insurance premium dollars that were to be invested in conservative investments. The residential mortgage-backed securities were those investments. Bank of New York Mellon is the trustee of approximately 750 of the RMBS trusts originally sold by Countrywide Financial. As trustee, Bank of New York Mellon was responsible for duties outlined in the PSA, the pooling service agreement. So the district court erred by relying on one provision of the PSA to the exclusion of the rest of the PSA terms. The important sections of the PSA and what we're going to ask this Court to review is section 7.01, event of default, section 8.01, duties of trustee, section 8.02, which is specifically subject to 8.01, certain matters affecting the trustee, and most importantly for this case, section 10.05, which requires Bank of New York Mellon to take action when it has actual knowledge, not written, actual knowledge of the occurrence of an event of default. There's no requirement of written notice in section 10.05 as there is in section 8.02. This is a very, very important distinction within the PSA. By ignoring this... Tell me what 8.02, Romanette 8, adds if it's overruled by 8.01, 7.01, etc. Is it meaningless? How does it apply at all unless it does what Bank of New York is arguing? If you look at 8.02 and Roman numeral 3, it sets up a good faith defense for the Bank of New York Mellon if it violates its duties under the contract. I'm looking at Romanette 8. Maybe I said 3, I meant 8. The one that says the trustees shall not be deemed to have knowledge of an event of default until a responsible office of the trustee shall have received written notice thereof. You have said, well, that's overridden by 8.01, which talks about knowledge or known. It's overridden by 7.01, various other provisions that state knowledge. What's it in there for? What's its purpose? What's its function if it's overridden by everything that refers to knowledge elsewhere in the agreement? Well, that's an interesting question, Your Honor, and judges in the Southern District of New York recently in National Credit Union found that to be an ambiguous term. Because if you look at 10.05, there's absolutely no requirement of written notice. If you look at 10.05, it's in appendix page 1250A, the trustee shall use its best efforts to promptly provide notice to each rating agency with respect to each of the following of which it has actual knowledge. There's no requirement for it to have this written knowledge. Well, there is a requirement. It's 8.02 Romanette 8. And I have a hard time adopting your interpretation of the PSA, which essentially says that wasn't in, you know, that serves no function. It is talking about the various aspects of knowledge here within the PSA. But when we're talking about knowledge of an event of default, they want that to be crystal clear. Because it's a very important point. Once there's an event of default, once you have knowledge of an event of default, the duties of the trustee, the duties of the bank change dramatically. And that's why you're arguing it had knowledge of the event of default. So it wants that to be very, very crystal clear. They don't have knowledge of an event of default unless they've received written notice. That makes sense that way. It doesn't make sense your way, I don't think. That's not an unusual provision in agreements either. I mean, defaults are a really important event. And it's not out of the ordinary or unusual that people would require events of default to be preceded by written notice to responsible officers. Well first, and I'll come back to that. There was actual written notice in the letter of Gibbs and Brunes that. That was notice that if you don't do something within 90 days, it'll be a default. If you don't cure within 60 days. 60 days, excuse me. So what we have here. And there's no evidence that it wasn't cured within 60 days, but in any event, the New York court said that that was all resolved through a settlement or something and that that notice had no later legal effect, didn't it? Well that's where National Credit Union. So that kind of all just disappears. Well National Credit Union came in to set aside the New York court decisions and that was just decided last month. So you have in this situation, Bank of New York Mellon is the party that does the actual exception reports. It issued the exception reports. 10.05 talked about actual knowledge. It had actual knowledge. So now you would wind up with the absurd result where Bank of New York Mellon would send itself a letter saying it hasn't been cured in 60 days, although it knows it hasn't been cured in 60 days. Because Bank of New York Mellon is the party that sends the exception reports to Countrywide. So it has, if you want to say it has written notice, it does because Bank of New York Mellon is the party that writes the letter of the exception report. Bank of New York Mellon is aware there has not been a cure event in 60 days. How do we know it's been aware that there hasn't been a cure? We have testimony to that from Bank of New York Mellon, that they knowingly did not follow up on the exception reports because if they did, they'd know they weren't being cured. So they would simply send out. And what's wrong with that? They know there's an event. Do they have a duty? Yes, they do have a duty. Under what provision? Again, 10.04, to let the credit agencies know when there has been an event of default. And it's the credit agency. With respect to each of the following of which it has actual knowledge. So that refers back to 8.02, Romanette 8. So that's why getting the notice of default is so important because at that point, 10.05a is satisfied and they have all these lists of duties. So does that make section 8.01 meaningless? No, there's a lot more in 8.01. All it says is certain things. We're talking about 8.01, Romanette I, I think, Romanette I. Unless an event of default known to the trustees shall have occurred, that's the only provision that's affected in 8.01 by 8.02, Romanette VIII. Shall have occurred and be continuing. Well, under, above that I, it sets up that no provision of this agreement shall be construed to relieve the trustee from liability for its own negligent act, its own negligent failure to act, or its own willful misconduct. Provided however that. You can't ignore that part. Then if you look at double I, unless it shall. Well, respond to Judge Hart's about the provided that. I mean, I'd like to hear your answer to Judge Hart on that one. Well, I was just reading from the double little I, where it goes on to say that the trustee shall not be liable for an error of judgment made in good faith. So it sets up a good faith standard, unless it shall be finally proven that the trustee was negligent in ascertaining the pertinent facts. And that's where our case is. Judge DeGiusti cut us off where there were material facts of the negligence. But the notice has to be in writing, right, under part eight, that the trustee shall be deemed to have knowledge of an event and shall not have been to have a knowledge of the event until the responsible officer of the trustee shall have received written notice. So it seems to me that there has to be not only notice, but continuing under part two. Which again brings us back to what was discussed in the National Credit Union case that was decided in October by the Southern District of New York, because it goes the other way from that logic. So we now have, if you want, the Western District of Oklahoma saying one thing, 10 of 13 cases from the Southern District of New York which considered the most recent cases in favor of the Bank of New York Mellon and rejected them. So now you have the two courts going the different way over the same clauses. It'd be our position that 8.01 and 10.05 are independent from that written requirement. Because if you have the requirement of writing, who would provide the writing here? The only party that would have the information of whether or not Countrywide was responding to the event of default, the exception reports, would be the Bank of New York Mellon. In which case then the Bank of New York Mellon would send itself a letter saying, by the way guys. It's the only entity that would know that this, that the problems had not been cured within 60 days? That's correct. It's left up to the Bank of New York Mellon to then advise the credit rating agency and the certificate holders like American Fidelity. So the letter here said, you better do this within 60 days and what was it asking? It's a cure of the various defaults. They don't have the notes in the underlying mortgage file. They don't have the credit rating. They don't have it in Countrywide's own files. Right. Which the Bank of New York Mellon takes possession of. So the Bank of New York Mellon has the files. They have access. They go through the files and they see what's missing. This is that whole debacle of the great real estate crash. Who wrote the letter? It wasn't Bank of New York that wrote the letter saying there's a problem, was it? No, it is the Bank of New York Mellon that writes the letter. No, no, no. That wrote the letter that you're talking about here. It was two people, the Hayes. Oh, Gibson Bruins wrote the letter. Yeah. And who are they? Gibson Bruins is a law firm representing parties after the RBMS's crash. So they knew that there was a problem. How did they know when you said Bank of New York is the only one who would know? They were making demands after the fact of the crash. So they were making demands and getting access to the files itself. And that's how they learned that the bank... And that's also how they would learn whether the problem had been cured, isn't that right? That would be correct. So Bank of New York wouldn't be the only one who would know that there hadn't been a cure. Well, you would need to have 25% or more of the certificate holders to make the type of demand that Gibson Bruins made. And that's what they learned. Were those PSAs that Gibson and Bruins complained about, those were among the PSAs that are subject to this lawsuit? Or were those different PSAs? I think they're different. I don't remember exactly. There are 750 of these. So I don't know if we have the information exactly. So this record does not reflect whether those PSA notices from Bruins, Gibson and Bruins, included PSAs that involved American Fidelity? What I'm saying is I don't recall, Your Honor. Since you just have a minute left, let's assume you don't prevail on the event of default part. What are your remaining, if any, claims? You've won under the Trust Indenture Act. Do you have any other claims? No. The only way we would win is if this Court finds that 8.02 does not eviscerate 10.05, 8.01, and 7.01. Okay. Thank you. Thank you. Any other questions? We have 36 seconds remaining. Good morning, and may it please the Court. Matthew Engber from Mayor Brown for the Bank of New York Mellon. The District Court's decision is consistent with the holding of four different courts that decided the same issues on appeal today involving some of the same contracts that are before this Court. But we're told that they're inconsistent with a whole bunch of cases from the Southern District of New York. Is that right or wrong? It's wrong. It's wrong. The Commerce Bank decision is not inconsistent with the holdings of some of the federal courts in New York. Those federal courts, there's a number of decisions coming out of the Southern District of New York. You're saying that this holding is not inconsistent with any of them or not with some of them? No. The decision from Judge DeGiusti is inconsistent with the decision of no court that has ruled on this issue, this specific issue of whether a contract that requires written notice before a trustee is deemed to have knowledge of an event of default should be enforced as written. It's not inconsistent with any decision that has ruled on the question of whether the trustee in these countrywide related cases received written notice of an event of default. So it's completely in line. Is it inconsistent with any of the holdings from all those Southern District of New York cases, which I admit I haven't read? No. Those Southern District cases are all, almost every one of them is at the pleading stage. And the essence of those decisions is that the plaintiffs in those cases, including against the Bank of New York Mellon, have alleged enough at the pleading stage to get beyond a motion to dismiss. Well, here, let me read you from Judge Codall's opinion in Phoenix. He says, moreover, in B&B Parabis, that's one of the cases you're referring to, the court concluded that based on the applicable indentures, an allegation that a trustee had actual knowledge was sufficient to state a claim for breach of the indenture, even in the absence of a written notice. How is that consistent with your position? The B&P decision had a provision that is different than the provision that's at issue on appeal in this case. The provision on appeal in this case is 8028. Judge Hart, you just read that language a minute ago. The language in B&P Paribas. Paribas, sorry. That's okay. B&P Paribas had a reference both to written notice and actual knowledge in the same provision. And it required the trustee to give notice of a potential or an actual event of default if it had actual knowledge or written notice. And so the B&P Paribas court held that there's no way to give effect to the actual knowledge language if we assume that the only way to have actual knowledge is through written notice. And the B&P Paribas court distinguished all of the cases that we're relying on appeal here. For example, the Argonaut decision from the Southern District, which had language. What about the language in Phoenix? In? In Phoenix Light that Judge Kotel, did it have the same language as in Paribas? So in Phoenix Light, in Phoenix Light before Judge Caproni in the Southern District of New York, that was a case by Investors Against the Bank of New York Mellon. We're not talking about the same case. I'm talking about Phoenix Light decision by Judge Kotel. Oh, Judge Kotel. That's what I read from. Yeah, so Judge Kotel in the Phoenix Light versus, I believe it's the Phoenix Light versus Deutsche Bank decision, was referring to the B&P Paribas case. But the B&P Paribas case had different language. Yes, and you distinguished that. But I'm questioning whether the distinction you're making was one that Judge Kotel was making. Was his contract, the PSA that was before the court in Phoenix Light versus Deutsche Bank, did that have the same language as in B&P Paribas or the same language as here or something different? I think it had a mix of language. So there were a number of different trusts that were before Judge Kotel in that Phoenix Light versus Deutsche Bank case. Some had written notice. Some had written notice or actual knowledge. And what Judge Kotel said was at the pleading stage, there's sufficient allegations that would allow the plaintiff to proceed into discovery to determine whether or not there was written notice of an event of default. All of the cases that have gotten beyond the motion to dismiss stage through discovery on this question in the case of Bank of New York Mellon, on this question of whether Bank of New York Mellon received written notice of an event of default, have gone our way. Every one of them, Phoenix Light versus Bank of New York Mellon in the Southern District, citing the Commerce Bank decision, which was the appellate court from New York. Again, the same exact language in these countrywide trusts. Now address the answers your opposing counsel raised about the only way that the event of default would be declared would be by the bank, BNY Mellon, giving notice. How else would that come about? We have the letter here saying cure within 60 days. If it wasn't cured in 60 days, who would know and how would it proceed from that? The certificate holders sending the notice would know. This is a perfect example. In this case, it was the certificate holders who sent it. It was the Gibbs and Bruns law firm representing BlackRock and PIMCO and MetLife and a number of other sophisticated institutional investors who have the economic interest in these transactions, unlike the trustee. They sent a letter to the servicer and to other transaction parties alleging breaches by the master servicer and stating in that letter that if those breaches are not cured within 60 days, that could lead to an event of default. The certificate holders were involved in that process every step of the way. Now how would the fact that it wasn't cured, how would that come up and what would happen then? So say it wasn't cured. How would the certificate holders know it hadn't been cured? The certificate holders using that specific example, which we know from the record in this case, the certificate holders were then engaged directly with Countrywide with respect to the allegations in that letter. Those negotiations eventually led to a global RMBS settlement involving several hundred Countrywide trusts. So the certificate holders know every step of the way whether there is a cure, there's not a cure, there's going to be a resolution in the form of a settlement or perhaps they instruct the trustee to engage in litigation or that an event of default had occurred in their view. And if it had occurred in their view, what would happen then? Then they would send a letter to the trustee. If they want the trustee to, if they want to trigger prudent personal allegations on the part of the trustee, if they want the trustee to step aside from its role, its very limited role pre-event of default and step into the prudent person post-event of default world, then the certificate holders would send a letter to the trustee saying an event of default has occurred. That would be the written notice. And is that in compliance with what the PSA says about how you declare an event of default? Does it require a high percentage of certificate holders or what's it require? So the contracts require that 25%, if the certificate holders want to send a notice, first triggering the chain of events that could lead to an event of default, they need to have 25% holdings in these trusts. So the letter that went out required 25%. The letter that went out had 25%. And that 25% requirement makes sense. You don't want very small holders filing strike suits or acting on behalf of the trust in a way that may be detrimental to the trust. That's the same 25% that would say you've defaulted. It's the same certificate holders. So if you have a letter written that does that, then you know these lawyers have authority with the same clients to obtain a notice of default. Right. And it makes perfect sense to leave this decision in the hands of the certificate holders. They are the ones with the economic interest in the performance of these trusts. They are the ones who are monitoring the servicer and the performance of the trust. They are the ones who are best positioned to decide whether it's worth pursuing investigations against transaction parties. Would you explain to me under Section 801, assuming a certificate holder has given notice of default, how 801 operates? It says that the trustee prior to the occurrence of an event of default has certain responsibilities. And after the curing of the events of default that may have occurred, then it shall undertake to perform such duties and only such duties as are set forth in the agreement. So how does that operate? Once a certificate holder gives notice of default, walk us through on your position of what happens. So once certificate holders send a notice to the trustee that an event of default has occurred, that is that the conditions in 701 Romanet 2 have been satisfied, the trustee gives the certificate holder's notice to the master servicer, expiration of a cure period without a cure. And they send the notice that those conditions have been satisfied. At that point, the trustee steps into that prudent person role. It's only at that point. Now, the event of default could be cured. But if it's cured, what happens? It could be cured within 10 days of the notice. And then the trustee under those circumstances would presumably receive a notice to the certificate holders that it's been cured. And that's why if you look at if the court considers 703B of the pooling and servicing agreement, it says that upon the occurrence of an event of default known to the trustee, the trustee within 30 days, I believe it's 30 days, needs to send notice to certificate holders that an event of default has been cured unless it's been cured. So this accounts for the possibility that certificate holders may send that notice that an event of default has occurred. But the breaches, the alleged breaches that gave rise to the event of default could be cured by the master servicer, in which case no notice needs to be sent to certificate holders. So, again, this is leaving the – I'm sorry. Can you explain that again? Sure. So after the trustee, after the certificate holders send a notice of an event of default to the trustee – Meaning it hasn't been cured. Meaning it hasn't been cured. Well, it just occurred. It occurred, right. And so it has not been cured. The trustee – Oh, I'm sorry. Is this a notice sent that you have 60 days to cure? No. This is the notice that all of the conditions have been satisfied. Okay. At that point, the trustee is required to alert certificate holders that an event of default had occurred. But 703B, which imposes that requirement, contemplates that there could be a cure post-event of default. Okay. Right? There could be a cure under 701.2, which means that no event of default occurs in the first place. Or there could be an event of default, and then subsequent to the event of default, a cure of the underlying breach that gave rise to the event of default. And that, to your point earlier, Judge Hartz, that clear line of demarcation between the pre- and post-event of default is absolutely critical. The trustee, before an event of default – and this is the prism through which the district court considered summary judgment, and it's the prism through which we ask this court to consider the appeal. Before an event of default, the trustee has very limited, very well-defined duties. It is not the originator, it's not the seller, it's not the servicer of the loans. It has no duty to monitor any of the parties to the transaction. It can rely conclusively on statements that are made to it. But it does have duties to keep its files in restraint and send the 30- and 60-day certifications about the facial sufficiency of these loans, of these mortgages. Yes. It has that administrative function of receiving files that are sent to it by the depositor, not the master servicer, and I'll explain why that's relevant in a moment. And then it has to send certifications out in accordance with the terms of the agreement. But other things such as the state of their files and the records and so forth, how would an investor ever know about those defaults? So that's not a default. I know, it's not a default. Well, it could be. Well, it's not. Not yet. It's not a default by the master servicer because the master servicer – remember, we're talking generally about countrywide, but there's countrywide as seller of the loans into the trust, depositor, and master servicer. Only a master servicer breach could eventually give rise to an event of default. Only the depositor has the obligation to deliver files to the trustee. So that breach, to the extent it's a breach, is not a breach that can give rise to an event of default, and that's a flaw in American Fidelity's argument. They refer to all of these various events that could give rise to an event of default. Nothing related to document exceptions can give rise to an event of default because it is not a servicer obligation. 10.04c of the PSA says the obligation to deliver documents will solely be the duty of the depositor and not the master servicer. But to answer your question directly, certificate holders could ask for information. Could less than 25%, could a single certificate holder say, I'd like this information? Or does it have to be a 25% notice? 25% certainly is the requisite percentage to direct the trustee to take action, to conduct an investigation. But even one investor could request information. And the trustee has the right to give certificate holders information. It may not have the duty, but it certainly has the right to do that. But this document exception issue is not something that bears on any of the event of default issues in this case. There are no master servicer obligations with respect to document exceptions that could give rise to a breach that could eventually, if other conditions are satisfied, give rise to an event of default. You said something earlier that causes me to ask this question. Say there's the notice, as we had here, cured in 60 days. It's not cured within 60 days. Is there still a strategic or tactical judgment call to be made by the certificate holders of whether or not they want to notify the trustee of this event of default? Is it sometimes in its interest not to give notice to the trustee, and so that they would want to be protected here because we don't want the trustee to get involved unless we tell them to? Is that at all? Yes. And that happens. How does that work? What's the downside of alerting the trustee? The trustee, as I said, has administrative duties that are laid out in the agreement. It's not servicing the loans it has. One second. Just be aware you're out of time and go ahead and answer the question. It has no duties to monitor the servicer. It doesn't have the expertise to engage in the servicing activities that certificate holders may be monitoring. It gets paid .9 basis points, which in a $100 million deal could be $9,000. And for that reason, certificate holders are not putting these types of responsibilities in the hands of the trustee. What's the downside to having an event of default notice to the trustee? Is there any? The downside is that the certificate holders may not want the trustee stepping into a prudent person role. Certificate holders may want to be the ones ultimately deciding exactly what should happen in a post-event of default world or pre-event of default world. Thank you. Thank you. Thank you. If you'll extend two minutes to counsel, please. Thank you. I'd ask the panel to look at LDIR versus DB structured products. It's a recent 2019 decision by the New York Appellate Division, which points out it's nonsensical to have the provisions we have here. But if I could answer your question to counsel, Judge Hartz, the trustee has no incentive to declare default. Because if it does, it becomes a prudent person, and it has to do additional work. Now, put in context, the whole defense here by Bank of New York Mellon, page one of its brief, it's only getting paid $50,000 a year per trust. We have 21 trusts. That's a million dollars a year. There's 750 trusts here. That's $37 million Bank of New York Mellon got paid, but it doesn't want to take on the additional responsibility of doing more work. It's all money to them on that. So what we have is the trustee does not want to take on the additional responsibility. It's not that the certificate holder, who's the passive investor, wants to do anything on its own. All of the files are with the Bank of New York Mellon. Well, not so quick. What agreement gives the trustee the power to declare defaults? It's the PSA. Because the sections that we've been working with and reading all provide the duties of the trustees upon certain notices of default. That doesn't imply that the trustee has the power himself to declare the default or itself. Well, once the exception reports, if the trustee follows up on its own letters of the exception reports, those are events of default. And if Bank of New York Mellon takes the second step to say, you did not cure this, you must now replace some of these underlying mortgages, which is what did not occur here. Bank of New York Mellon never required, never required, countrywide, to replace any of the defaulted, faulty mortgages in any of these pools. Because had it done that, it then takes on responsibility of more work, which it claims it's not getting paid for. It's only getting $37 million a year, which is a lot of money outside of Wall Street and Scarsdale and the brownstones in Brooklyn. You expect a lot for a million dollars a year. And we didn't get that. We didn't get it. Thank you. Thank you. Case is submitted. Counsel are excused.